A couple of things about how the clocks run on this case before we start and how argument can be divided. First, when the digits go down and it goes from green to yellow to red on the clock on the podium, the numbers keep changing, but it's not telling you how much time you have left. Once the light is red, the clock changes and it tells you how far over time you've gone. The next thing I wanted to mention was on dividing your argument between argument in chief and rebuttal. Just do whatever you want. You need not ask for leave of court. You don't have to announce it in advance. You can, if you like, sense that the questions are petering out and save the rest of your time for rebuttal. Just do it as you like. The tricky part here is dividing time if you have multiple attorneys on the same side. What inevitably happens is the judges ask all their questions of the first attorney to stand up and the subsequent attorneys don't get a chance to be heard. We try to squeeze in a few seconds for them. If you want to divide your time between attorneys on the clock separately, so if it's 8-8-4 or something like that, she'll just run the clock 8-8-4. First case is Shalimar v. Mukasey. Please report. My name is Mykla French. Myself and Ross Brown are the counsel for the petitioners. We would like to speak for nine minutes each and plan two minutes for rebuttal, please. Will the clerk run it 9-9, please? The Wahudis are an ethnic Chinese Christian family from Indonesia. They have sufferers from mental illness as family members. Hendra, the father, is a political cartoonist who is critical of the Indonesian government. We have two points we'd like to cover with you today. I couldn't figure out where the Indonesian government had actually done anything to him. He said his paper went broke, but papers go broke all the time. It's not just that it went broke, Your Honor. If you'll look at page 740 of the administrative record, Hendra testifies with direct evidence that the newspaper was closed because it was publishing political cartoons critical of the government. Was that the Suharto government or the subsequent government? That was the... He published... In Hendra's view, they're like egg rolls. They're all similar to each other. So he's critical of the government until conditions in Indonesia improve. So he published cartoons critical of Suharto and other government figures and continues to publish cartoons critical of government figures in Indonesia. So I would like to... Which government closed his paper? Excuse me. Which government closed the paper? That would be the government in 1996. So Suharto regime. I would like to cover the legal errors committed by the agency. My partner would like to address the merits of the case. The agency failed to comply with law, which precluded proper consideration of the merits, which in turn prejudiced the Wahoodies because their asylum claim is indeed meritorious. We note that we're not asking this court to substitute its judgment for the agency. Rather, the legal errors below were so egregious, we're asking the court to remand so the agency can consider the case in accordance with law, which we think is appropriate under INS Viventura. The agency's two main legal errors were that the IJ failed to consider the record on the whole at the initial asylum hearing and that the BIA gave wholly inadequate treatment of the evidence submitted with the motion to reopen. It's well established that an IJ is required to consider the record in its entirety in an asylum proceeding. I don't understand something about the motion to reopen. It looked as though the grommet of it was that the mental disease suffered by the husband and I think one of the children, but under he, that's not a change in country conditions, it's a change in personal conditions. It doesn't matter for a motion to reopen. The evidence that changed conditions that had to do with the personal conditions of the petitioners was submitted in conjunction with evidence of changed country circumstances. What's the changed country circumstance? The only one I could see that was relevant is Suharto was gone. The petitioners submitted evidence that the mistreatment of the mentally ill is on the increase in Indonesia. They also submitted evidence that despite Suharto being gone, that persecution of political dissidents is again on the rise. They also submitted evidence that Yusuf Kala, who is well noted as an anti-Chinese figure and anti-Christian figure, anti-democratic figure, was elected vice president and he made statements such as Chinese should consider the choice between being looted and mobbed or being discriminated against during his 2004 election. Ms. French, can I turn to the mental illness? Yes. I thought I read in the record that your client had been treated at some point with medication, but that the medication stopped. So is your position that the client still suffers from mental illness or is he simply declining medical treatment for it? Or that the medicine was stopped because... His conditions have improved since he's been in this country. Why would it be irrational for the IJ to conclude that if the doctor stopped administering medication for the mental illness, that his mental illness is worse and that he will be institutionalized if he returns to Indonesia? What in the record would require us to compel the opposite conclusion? If you look at page 122 in the administrative record, that's an affidavit submitted by the Wahoodis doctor. Now that was submitted with the motion to reopen. The mental illness became more significant upon the increase in mistreatment of the mentally ill, which deals then with the motion to reopen. So it wasn't the IJ... I'm not sure you're answering my question. Perhaps I didn't make it very clear. Sorry. As I read the doctor's affidavit, the doctor acknowledged that for some period of time he administered medicine to treat it, but he stopped. Right. And that's the evidence that's before the immigration judge. Now in order for us to reverse, we must find that substantial evidence compels the opposite conclusion from the one that the IJ reached. Can you help me with the evidence that would support the opposite conclusion? The doctor also noted that the bipolar disorder is erratic, but that he's never left Hendra. Hendra's not been cured. He's never left Hendra sort of finished with him and you're done and treatment is over. It's been a constant monitoring. And at times Hendra doesn't need medication, his condition improves, he feels safe in the country, the symptoms of his post-traumatic stress syndrome decline. The problem I'm having with the declaration is that you're making the argument, but the declaration itself is void of those factual conclusions. It basically says, I treated him, I'm not giving him any medicine now, but the treatment of the mentally ill in Indonesia is atrocious because of how they institutionalize them. What's missing from the declaration is that my client's mental condition is so bad that he would be institutionalized if he returned to Indonesia and therefore would suffer future persecution based on his mental illness. The doctor also testified that he feared that there would be a deterioration if Hendra was sent back to Indonesia. He did testify to that. And I apologize, I don't have the site at the ready, but I can find it. Will I find that at AR-122 in the doctor's? No. The declaration at 122 is contained with the motion to reopen. The doctor's testimony at the initial asylum hearing is where you would find that testimony that talks about that he fears regression of Hendra's mental state upon return because he won't be able to be monitored. I don't quite understand how that fits into the legal theory. In order to get asylum, it's not enough. Well, he has to show a well-founded fear of persecution. Less capable physicians is not the same as persecution. Certainly not. The problem is that mental illness in Indonesia is considered a spiritual defect. And persons... But on that score, you have to show a changed condition, right, in the treatment of the mentally ill in Indonesia. And it hasn't deteriorated... I don't think it's deteriorated to the degree that you can call it changed conditions. Has it? Well, I think there are a couple of things. I think that after the natural disasters of 2004, 2005, the already primitive... The primitive care was overrun with skyrocketing mental illnesses as a result of those. I know, but being in a poor country and not having enough money is not conditions that would lead to a grant of asylum. No, it's not. But the problem here is that the petitioners, particularly Krista, is prone to psychotic episodes. And those are the kind of things that make someone stick out, make them highly visible, and especially considering... No, no, no, but you're, again, veering away from the changed country conditions. In other words, country conditions changed to the degree that what was not persecution before is persecution now. To the degree that they might have been able to get some treatment prior to the 2004, 2005 natural disasters. That's just not possible anymore. And that's due to, I'll call it, what, budgetary shortfalls, right? I think you could say budgetary shortfalls. More to the point, I think you could say that there's a lack of understanding in the country of what mental illness entails. You know, they've been overrun because of these disasters, and they can't... What was primitive is even worse now. But that, to me, doesn't indicate some deliberate government action. Well, I think that the treatment that those people do receive when they come in, however, such things as being locked in public stocks, being subjected to horizontal treatment where they're... That's always been true. Right. But there might have been pockets where there were psychiatrists and psychologists at the University of Jakarta, for example, who, after the 98 riots, were fired due to their Chinese ethnicity. So it's sort of whatever remnants were there have just been wiped out now. Which prong of persecution would that fit under, under your theory? Which of the five grounds? I think it would be a social group. And the social group would be defined as the mentally ill. Or maybe even narrower, borderline psychotic, something like that. Bipolar, suffering from psychotic episodes. I don't recall the briefs focusing on persecution of a social group. I think what made most sense to us is the fact that we've got this Chinese Christian family down the street, just getting off the plane from America. They walk in and they've got these two people who are suffering from mental illness. This is not good. Anybody with an illness would rather be in the United States than Indonesia. Anybody without an illness would probably rather be in the United States than Indonesia. But I don't understand where the theory of persecution of the social group of the mentally ill is argued until today. And I don't understand where there's a change in country conditions that would allow the late motion to reopen. It looks as though, for that matter, treatment of people with a mental illness changes radically in the United States every 10 or 20 years. I'm just having trouble putting together the theory. I think where you can hang your hat is the idea that the mentally ill are viewed as spiritually tainted. And that represents a risk of individualized harm for these Christians. They're not just going to be the ethnic Chinese Christian family down the street. They're going to be the spiritually tainted Christians down the street. Is that the real problem with the case, the fact that the law changed under Lolong? Initially, the thrust of the petitioner's application was, we are Chinese Christians from Indonesia. And before we took Lolong in bank, you would have been pretty confident that you could win on that argument. But now the problem is, in light of the in-bank ruling, the Chinese Christian, I'm just a member of this group, doesn't quite get you there without particularized threats. So it seems to me your theory has shifted to a cumulative theory. That, well, it's that plus this mental illness plus the political cartoons that in total compel the opposite conclusion. Am I misunderstanding the shift? With one important point, the initial asylum application did include Hendra's political cartooning. And the IJ, to borrow language from Justice Trott, the IJ missed the dinosaur in the haystack. Hendra testified directly that his newspaper was closed because they were publishing politically dissident cartoons. That right there is enough to distinguish them from Marjorie Lolong. Enough to establish persecution? The problem here is that there's a suggestion in the record that the reason the business closed was due to insolvency. It may not have been a favored publication of the Suharto regime. But, again, applying the general principle from Lolong, where is the individualized threat of persecution to the applicant on this record? The best you can do is to say, well, he does cartoons, and his newspaper or publication was put out of business, although the IJ found it was more economic than political persecution. What do we do with that? I think we look at Elias Zacharias that says that the motivation, evidence of the motivation, can be circumstantial or direct. And I think we have both circumstances. What motivation? The IJ found the motivation to be economic. That's why he lost his job. Right. And Hendra testified, again, on page 740, he gave direct testimony that the reason that the newspaper was closed was because they were publishing cartoons critical of the government. But even if that's true, and there's evidence that supports the economic reason for the closure, I'm still having a hard time finding the direct link between government action and political persecution of the petitioner. I think it's the well-founded fear of the threat of persecution. Despite the turn initially right after Suharto's change in regime, persecution of political dissidents is on the rise again. Laws are being used to throw people in jail for insulting the president. Bodies have surfaced on the steps of the courthouse that show signs of torture for people who were rallying at peaceful rallies. I think there's a real threat there. But that gets us back to Lolong, does it not? I mean, Lolong acknowledged that there was persecution generally of Chinese Christians, but we said that's not enough. There has to be a particularized showing of threat to this petitioner. So bodies floating in the canal is not good, but Lolong says that's not enough. There is a link, though. I mean, Hendra testified he comes from a family of political cartoonists. He was famous in Indonesia. His publications are everywhere. And especially, again, I think we can't pick up these factors separately. We do have to look at the real situation, and considering, again, the mental illness, the spiritual tank, Christian, he's a famous political cartoonist. I guess I probably ought to let your co-counsel be heard. Thank you, Your Honors. Had the agency properly considered the merits, it would have seen the Wahoodies are indeed eligible for asylum. This is based on their membership in multiple protected groups. What's the persecution? I mean, the woman got groped once. And somebody touched her breast once, and the man got robbed, and when he was robbed, the robber made an anti-Chinese remark. I would imagine that there's not a country in the world where that sort of nastiness has not occurred, including ours. As for robbers making ethnic remarks while they do the robbery, I would be surprised if there's a country in the world where that hasn't occurred, including ours. I don't understand the persecution, and losing your job. My gosh, small-town papers criticize the town fathers, and all of a sudden all the legal ads are in the other paper that doesn't criticize the town fathers, and the paper goes broke. I just don't get what the persecution is, as opposed to discrimination, which obviously there is against Chinese Christians in Indonesia. There are a few things that are important to note, Your Honor. One is that we're not asserting that the Wahoodies are eligible for asylum based on past persecution. We're asserting that they have a well-founded fear of future persecution, and this is seen as... That's true, but usually the well-founded fear of future persecution is based on bad things that have happened in the past and are continuing. That is part of the particularized risk of harm, part of the showing of particularized risk of harm that they have. The Wahoodies belong to a significantly disfavored group, multiple significantly disfavored groups. For instance, they are Chinese. As this Court has said in Sale, the Chinese are a significantly disfavored group. They are Christian. This Court has not ruled specifically on the status of Christians in Indonesia. However, the Fifth Circuit in Edward has said that they actually suffer a pattern or practice of persecution. They belong to other groups that make it so that they are so... They are the Jews of Indonesia, the Jews are the Jews of France. A lot of places it's bad to wear a yarmulke there, but it's still not persecution, it's discrimination. That alone is not persecution, but it doesn't place them in a significantly disfavored group. And because they are in a significantly disfavored group, the particularized risk of harm that they need to show is minimal. As this Court has said in Kotas, for instance, there may be such a high disfavored group that, say, someone in a subgroup of this disfavored group may not need to show any particularized risk of harm at all. Tell us, in your case, what is the showing of fear of future persecution? The important thing when discussing a particularized risk of... By the way, what are you arguing? Are you arguing the review of the denial? Or are you in the motion to reopen? Who are you arguing now? We're arguing that because of the various errors that were... Because of the fact that the agency below never truly reached the merits, that this should be remanded so that the agency can consider the merits. So the argument you're making now is on the motion to reopen. Is that right? Yes. I just want to be sure I can follow you. All right. So on that motion, then, okay, now tell me what evidence there is and that was presented to the I.J. of fear of future persecution that he should have paid more attention to, apparently. That's your argument, right? Correctly, Your Honor. What is that evidence? Well, there is evidence of changed country conditions regarding Chinese, changed country conditions regarding Christians, the fact that Krista Wahoudi, and this is very important, the earlier discussion focused some on Hendra Wahoudi. Krista Wahoudi, and this was included in the motion to reopen, actually suffered a psychotic episode here in the United States. She was involuntarily committed because of that. That's what we said in he, didn't we? Yes, Your Honor. Part of it is the fact that I should focus more on the changed country conditions in relation to Christians, Chinese, that type of thing. Well, let's talk about Christians because the I.J. did talk about the efforts of the Mormon Church to proselytize and that it is expanding, and as Judge Kleinfeld points out, they may not be a favored group within the nation, but the I.J. did consider the country condition report and concluded that the Mormon Church is not being persecuted by the current Indonesian government. In fact, he found that the church is growing. So how does that support your claim that they are members of a disfavored group for whom there is a likelihood of future persecution if they return to Indonesia? There are a couple of important points. One is that LDS are Christians. Christians have been found to, the evidence shows that they suffer a great deal of harm. For instance, we've noted in our administrative record, Edward has noted also that, for instance, several years ago, due to violence against Christians, 3,000 Christians were killed on account of their religion. 500,000, half a million Christians were displaced on account of their religion. They saw their churches burn. This is not a rosy picture for the Christians. But the problem is that this evidence was before the I.J. He considered it, but he also considered it in connection with the 2000 State Department country report, which he describes at some length at pages 8, 9, and 10, E.R. 576 through 73, I guess it is, of his ruling and basically found the opposite of what you are urging. So where is the due process violation in the way that he evaluated this evidence that constitutes an abuse of power? Is there discretion when the BIA refused to review it? Part of the problem is that the I.J.'s reading of the country report was, I don't want to say selective, but it was not complete. Just a few paragraphs down, the country report states that things are not very good for Christians. This is exemplified in how this court in Sale discussed the harms that Christians suffered. And I should also note, going back to what you had mentioned about the growth of the Mormon church within Indonesia, I think that it would be just as reasonable to find, certainly, that fundamentalists are going to feel more threatened by a group that seems to be getting bigger and bigger and bigger. If you have some group that is out there on the fringes. What the judge said, as I recall, was, on the one hand, there is discrimination against Christians. On the other hand, unlike most other Muslim countries, they actually let Christians proselytize, and the LDS church has been proselytizing with some success, and they continue to be allowed to. Now, our role in this is really not to decide if we agree with the I.J. It's to decide whether the evidence compels us to find no substantial evidence on the record as a whole for the I.J. This New Deal, universal camera, deference to administrative agencies. I don't understand your theory for getting around that. Well, an important thing here is that what we're saying is that because of various errors, the I.J. never really considered the merits of the case. And so this court, while we believe... What I hear you saying, though, is not that he didn't consider the merits. You just don't like the way he balanced the evidence, that he decided it wrongly, and that that somehow violates due process. And that's where I'm having a hard time following your argument. If he had said nothing about this, if the record showed that you'd submitted all this documentation and the I.J. had never discussed it at all, I think you'd have a much stronger due process argument. But what I really hear you arguing is our due process rights were violated because he decided the application adversely to my petition. Part of the problem is that they were not... It's not just that they decided it adversely to what we were proposing. It's that there was not a proper consideration. I mean, the I.J. said, I tried to look at the documents. I see that my time is out. May I have time to briefly continue? I have not, you know, I tried to look at all the documents. There's apologetic statements. And on the whole, and my co-counsel can address this further, it just appears as though the I.J. did never really properly consider the merits. In wrapping up, I should just note that the Wahoodies belong to a significantly disfavored group or groups. They are Chinese, they are Christian, they are political dissidents, they are mentally ill, and thrown into the mix is the fact that some are female and they have been westernized. This makes them stick out even more. As this Court has said, the thing in disfavored group status is, is there something that makes the petitioners stick out above and beyond the disfavored group? The uniqueness of someone who belongs to all of these, who has all of these characteristics. The fact that Ms. Wahoody was a leader within the church or an active translator within the church, a public position, the fact that there have been attacks on their family, the fact that there has been some things that the Wahoodies themselves have suffered. Wait a minute, I didn't get any attacks on their family. I think a brother was driving through a riot and somebody threw a rock through his window. Chinese guy in a car, not this family in particular, it sounded like. Wrong guy drives through a race riot. Anywhere that happens. The family's house and business cluster had been attacked and burned to the ground. For instance, the cousin's house and business was burned to the ground. The sister was forced to flee. Those Wahoodies who have remained behind, you have Irma's sister who looks Japanese, she doesn't look Chinese. You have Irma's brothers, they've converted to Islam and have married native Indonesians. The fact especially that the brother was beaten and robbed, their family house and home cluster has been burned to the ground. These are rather personal things when someone comes to burn your house down. But this, taken in context of everything else, the uniqueness of someone who has all these characteristics that they do. The fact is, as my co-counsel discussed briefly, is that the Wahoodies are not just the Chinese couple down the street, the Chinese family down the street. They're the Chinese family, which is significantly disfavored, as this Court has stated in sale. The particularized harm that they have, which is different from Mulong, is that they belong to all these categories. They are also the mentally ill family down the street whose daughter is having psychotic episodes, whose husband is a political dissident. They stick out. There are so many things that come together that point them out to their persecutors. That particularized harm, I mean, I understand that you are trying to get around Mulong's conclusion that merely being a member of Chinese, Christian, female, Indonesia is not enough. I thought particularized harm meant that it had to be specific to the petitioner. What I hear you saying is the particularized harm can be excused if there is a cumulative basis from which we must compel the conclusion that they will be individually persecuted because of their membership in all these various groups. I'm not saying that it needs to be excused at all. I am saying that, as Nguyen has stated, the particularized risk of harm is what, quote, makes them likely to come to the attention of their persecutors. For instance, in the sale, the Court said, well, they've been persecuted in the past. That's evidence that they're likely to come to the attention of their persecutors. The point is, what is making them stick out? What is making them more noticeable? In Mulong, the argument was, what makes them stick out is, I'm Chinese, I'm Christian, and I'm female, and I'm back in Indonesia. And we said that's not enough. That doesn't establish, that may very well establish a subjective view of persecution. It does not establish the objective prong which must be met by individualized evidence of persecution. Mulong, the analysis in Mulong was done under a pattern or practice analysis. The Court said that the petitioner in Mulong put forward not one drop of particularized risk of harm. What the petitioner in Mulong was saying is, I'm Chinese, I'm Christian, I'm female, I live in Indonesia. But the evidence included the same arguments that you're making, the state, the, not humanitarian, but the various watch groups, reporting on acts of abuse against Chinese Christians in Indonesia. So in that respect, the evidence is identical. The evidence regarding whether the Chinese are a disfavored group is the same, correct? Or whether they are a group suffering a pattern or practice of persecution, which is what was discussed in Mulong because there was no particularized risk of harm asserted, is the same, correct? And this Court... The problem was the same problem you've got here, that Mulong had been in the United States for so long that she couldn't really point to any specific acts against her. Your clients have been here since, what, 1990-something? Yes, 98, I believe. So they've got the same problem. They've been here for 10 years, and they basically have not been back in what they perceive to be the return. Let me compare them to Sale and contrast them with Mulong. In Sale, the harm that was suffered that showed particularized risk of harm for the petitioner in Sale was the fact that he was there during the 1998 violence. And the Wahoodies, their family, as documented, suffered greatly during this violence. The Wahoodies would have suffered from this violence also had they been in Indonesia at that time. And it would be ironic and extremely unfortunate for the Wahoodies to have a short period of fortune by being in the United States during that period, only to suffer a lifetime of misfortune by being sent back just because they weren't in the same place during this 1998 violence as Sale was. In Mulong, again, the difference, and I think it's a very important difference besides the fact that the petitioner, that the Wahoodies are mentally ill and political dissidents, another important thing is that, again, this court found that Mulong did not put forward any particularized risk of harm. But that is not at all the case with Wahoodies. Now, I realize that you were discussing similar evidence. That similar evidence regards the general conditions against Chinese and against Christians. But you're relying on as well. You concede that, do you not? You rely on that plus. That is part of the analysis. But exactly, the very important difference between us and Mulong is that there is so much more that we have that Mulong never asserted, because Mulong never asserted a particularized risk of harm, which is what we do in addition to the other multiple categories that we belong to, which is extremely important, considering the fact that Chinese alone, let alone Chinese-Christians et cetera, are so significantly disfavored as this court has found it. Counsel, I should probably make you sit down now so we can hear from your adversary. Thank you, Your Honor. For these reasons, we do ask that this case be remanded. Good morning. Tom Dupree on behalf of the United States, and may it please the Court. The agency's decisions denying asylum and its subsequent ruling declining to reopen proceedings are each supported by substantial evidence. Could you explain something to me that confuses me? With the changes in the immigration law, I just get confused on this. It seems like on the motion to reopen, we're looking at it like any motion to reopen. Was there, basically, was there a change in the country conditions that would justify a second look? On the substantive question of asylum, I really don't get how, because the habeas bounced around in the Real ID Act, we wind up reviewing the asylum determination just as though there were a timely appeal to the BIA and petition for review to the Ninth Circuit. I don't understand. Could you explain it? Well, first of all, I agree with Your Honor. It's perplexing. In a nutshell, what happened is this, is that at the time Real ID became effective, the petitioners had a pending habeas petition with the district court that sought to challenge the IJ's refusal to grant asylum. But a habeas petition, the Real ID Act changed where those go, but it didn't change, I don't think, what you do when you get an IJ who makes an erroneous asylum decision. What you do is you petition to the BIA, you appeal to the BIA and then petition to the Ninth Circuit. So I don't get where they're any better off because of the Real ID Act than they would be without it. Well, I think they're better off in the sense that, as Your Honor knows, they originally sought review in this court through an untimely PFR that this court dismissed. The reason they benefit from Real ID is because, due to the fact they had a pending habeas petition in the district court at the time Real ID became effective, under the terms of Real ID, they had a pending habeas petition that was not reviewed. So I don't think the BIA shouldn't have been there, should it? Wouldn't they have to go through the BIA appeal and petition for review to the Ninth Circuit in a timely way to get somebody to look at the act? Well, prior to Real ID, I think, occasionally at least, petitioners would just seek to challenge these decisions directly in habeas. And there, as Your Honor correctly knows, there were a lot of problems with that, and I think that really was the... It wasn't quite open there, all those sincere categories. It wasn't. So what Congress really was trying to do is simply channel everything through a known PFR process, but of course it didn't want to disadvantage people by just having their habeas petitions terminate. And of course, as the court knows, we the government are a challenging jurisdiction. You've got it. You've got it. You just do it in a different court. You're not challenging jurisdiction, but Judge Kleinfeld's question does raise our scope of review, whether it's any different. And the question I would ask of you is, because it is now before us on habeas rather than a petition for direct review, may we only grant relief if we find a constitutional violation as opposed to an administrative agency type review that we normally apply to these types of cases? That's a very interesting question. My instinct is to say no, but I think one way the court could certainly address it is to say, regardless of whether we may... Well, neither of you briefed it. I was actually surprised, frankly, that the government conceded the jurisdictional question so broadly, because while we may have jurisdiction, it doesn't answer what the scope of our review is on habeas. Right. I understand Your Honor's question. Of course, it would be our position that regardless of the scope of review, the petition should be denied, because they certainly can't prevail on a constitutional claim. If our presiding judge will give a minute or two of rebuttal to your opponents, I'll ask them the same question and see what they have to say. But it seems to me that we might be able to get there by simply saying, okay, the issue is one of due process, which is a constitutional issue. And therefore, we can at least examine whether it was an abuse of discretion to refuse to reopen on the ground that the petitioners were deprived of due process, as they're urging. But I do think, Your Honor, I was with Your Honor up until the end, where you mentioned the motion to reopen. I believe there's no question whatsoever about jurisdiction as to that order. In other words, what we're talking about right now is a matter of jurisdiction. The jurisdictional conundrum concerns the initial denial by the I.J. and the B.I.A. With regard to the motion to reopen, I do think that is properly before this Court. Correct. But is the scope of our review on the companion habeas limited? I understand that question, yes. Could you give us the answer? Well, my sense, and again, the only reason I'm hesitant is because, as Judge Tomlin correctly noted, the government didn't address this point in the briefs. Exactly. That's why we're asking. My instinct is to say that this Court's review would be confined to constitutional claims. Or jurisdiction. We have to consider jurisdiction sua sponte. That's right. I never have understood exactly why it is we're looking at the merits of an asylum petition where there was not a timely appeal to the B.I.A. and a timely petition for review to the Ninth Circuit. I think they would have to package it as a due process violation. And that's what we would have. So we can't really decide whether there was substantial evidence on the whole record to support the asylum determination. We can't really decide whether the evidence compels a contrary asylum decision. We can just decide whether there was a denial of due process of law or other constitutional right in the I.J. The I.J. is initial, and the B.I.A. is initial. Is that the right answer? I think that's right. You're saying the jurisdiction granted by the Real I.D. Act, which includes not only constitutional but other questions of law, does not apply in this case. Is that what you're saying? Well, that provision, I think that's right, that that does not apply. Because I think the relevant provision is the one that simply... So my next question is, then why does it not apply? Because I believe that provision... We're talking about the habeas case. Right. Because I believe that that provision is kind of the going forward provision. In other words, that it's governing things that were properly filed as PFRs. I think a contrary conclusion would require this Court to say that in saying pending habeas petitions get transferred to the Court of Appeals, we're going to expand review. And I don't think Real I.D. would support that, to give expanded review over an existing petition. I think what Congress was trying to do is simply preserve the rights that petitioners enjoyed as of that moment and not divest them of those rights. But it didn't want to expand the scope of review over pending cases. But it does apply to habeas petitions that are properly transferred to the Court of Appeals, right? Those pending at the time Real I.D. became effective. Well, again, I'm not sure about that to the extent it would expand the scope of this Court's review. I think what Congress was really getting at was it simply wanted to preserve what they would have gotten under habeas review in district court. What would they have gotten? They would have gotten review of constitutional claims. Constitutional claims, and that's what you're, so I guess you've come around then to the position, maybe that's what you started with, or at least what Judge Tallman started with, is that, so on that, on the habeas case here, we're confined to reviewing asserted constitutional violations. I believe that's correct. Let me, if I could, spend a moment talking about the initial decision. Regardless of this Court's review, of course, it's our position that PFR should be denied. I think Judge Kleinfeld, Your Honor, correctly summarized the state of the record when Your Honor noted that the petitioners have suffered no past persecution personally. The sum total of their personal experiences were those two instances in which Mrs. Wajudi was groped, and the petitioners have suffered no past persecution personally. One was, I think, in 1964, the other was in 1984, and, of course, there was the incident involving Mr. Wajudi on the bus where he was mugged and someone made a racial remark in taking his money. Clearly, that doesn't amount to past persecution. In fact, during the hearing before the IJ, Mrs. Wajudi conceded that from 1984 up through 1997, when she left Indonesia, she had suffered no harm whatsoever. Of course, it's also true that the Wajudis have many relatives who still live in Indonesia. Although in some instances they have been caught up in the general rioting, they have not suffered anything that would remotely approach persecution. There was one incident where they had a parked car, no one was hurt, and a rock was thrown through the window.  What this Court has emphasized... I'm not sure. I believe it was the cousin of the husband. It was a relative whose house was burned, but I don't believe that the record shows, or certainly doesn't compel the finding, that the house was burned as part of a targeted effort against those individuals. I think to the extent that the petitioners' relatives have suffered any sort of harm, it's typically been in the context of being present when there was general rioting, or when a large number of people were present. When a large swath of buildings were burned, and they happened to be in the wrong place at the wrong time. What this Court has emphasized time and again, both in its more recent disfavored groups cases and elsewhere, is that you simply need to prove individualized harm. Lo Long was absolutely clear about this. Lo Long said, you simply can't state, I am a member of such and such a group, therefore I am entitled to asylum. You need to show individualized harm. In the case of Sale, this Court said, Sale's past experiences establish a sufficient personal connection to the general persecution directed against ethnic Chinese in Indonesia. The same is true in the Imad case, where the petitioner gave evidence that demonstrated at length that he had been personally harmed, and the Court thereto found the requisite individualized, particularized showing of harm. That showing is clearly absent in this case. Turning to the question about reopening, I think it's abundantly clear that there was no evidence that would compel a finding sufficient to change, sufficient to warrant reopening this case. I think the Board considered the evidence. It specifically noted the types of evidence the petitioner had introduced to justify a reopening claim. It didn't agree with the petitioners, but of course, as Judge Tallman noted, that in and of itself doesn't warrant reversal. The IJ and the Board simply took a different view of the evidence. And of course, the question before this Court is not, could a reasonable fact finder have reached the conclusions that the petitioners urge? Rather, the legal question is, does the record compel that conclusion? And that test is plainly not met here. Unless there are any further questions from this Court, I will see the balance of my time and ask that the petitions be denied. Thank you, Counsel. The petitioner's side went way over time. We asked a lot of questions, but we'll give you two minutes anyway. And I would like your views on the scope of our review. Right. It's my understanding, first of all, I think the answer lies in Section 106. It does tell that the Court of Appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under Section 242. Except that the time limit doesn't apply. And tragically, I've forgotten the case, but I do believe that there is a Ninth Circuit case that explicitly states that the scope of review hasn't changed. I think your purview now is as a petition for review court, not a habeas court. Even so, my reading of the habeas law doesn't confine habeas jurisdiction just to constitutional matters. I think it also extends to legal questions, which gets me back to our point. Judge Kleinfeld, you were talking about the substantial evidence standard. I think what we're saying is whether or not the I.J. considered the record on the whole is a legal question. And that gets de novo review. And I think we know in this case that the I.J. did not consider the record on the whole. He begins with the statement, I made an effort to try to look at this. De novo review in the face of all of our case law that says that we must, to reverse, we must conclude that the evidence compels the opposite resolve. It's true, but I think it's really a legal question of whether or not proper legal case precedent was followed. And I don't think it was. I think we have all of these warning bells, the I.J.'s own apologetic statement, the fact that he gave disproportionate weight. Well, the apologetic statement was, you know, I don't have the authority to grant temporary protected status as we have done for Nicaraguan refugees. That's a congressional determination that I don't have the power as an I.J. to make. How is that a violation of law or due process? The case, the comment that I was referring to is he said I made an effort to try to look at this record, but I didn't see anything specific to petitioners. Wasn't that in response to his concern that whoever was representing the Wajudis at that point had just dumped 500 pages of material on him and asked him to root through the record on his own rather than pointing out where the specific evidence was that supported their application? How is that a violation of their constitutional rights to due process? He had the wrong legal standard in mind when he was surveying the record. Isn't that what he was referring to, or did I misread the record in that respect? Actually, the statement about could you please point out anything specific was after. He asked that question after he made the wholesale comment I made an effort to try it. We have the same problem, sadly, with some of the people who bring petitions and appeals before us. Not current counsel, but it is a problem for judges. You've got to help us find out where the truffles are buried. Right, and I think that perhaps counsel didn't find the question necessarily germane because evidence can go to supporting that a group is disfavored, it can go to corroborate testimony, it can go to all of these other things, not just being specific to petitioners. But I think that just to get back to the jurisdiction that you're sitting under now, I think we do have a due process violation. I think that the Wajudis were... I don't understand. What's the due process? If I understand your argument right, you're saying when he says I made an effort to wade through all this stuff, that we should understand that to mean I did not look at this stuff. And I did not look at this stuff is a due process violation because he has an obligation to look at it. Have I got your argument right? That sort of amazes me. I mean, I looked at the excerpts in this case. I couldn't lift them. There's too much stuff. If somebody doesn't help me get through it by showing me what to look at and narrowing it down to what's relevant, what am I supposed to do as a judge? There was a great index for all of this information, and the petitioners are in a difficult... They're between a rock and a hard place as well because they have such a heavy burden of proof, of persuasion. I mean, it's difficult. But I think in Laredo Martinez, the BIA plainly stated it reviewed the record of proceedings, and the court there found that the presumption wasn't rebutted. I think in contrast, we have the, well, I made an effort to try, as well as coupled with the disproportionate weight that he gave to a few sentences, looking at it with the wrong orientation, et cetera. I understand the argument now. The most reasonable way to construe that argument, I made an effort to look at all this paper, necessarily means that he didn't look at all of it. Isn't that your argument? You can't say I made an effort to look at it as saying I looked at it, or I looked at what I thought was necessary. You don't think it amounts to that. It's like a confession I didn't look at at all. I think it's an apology. I just want to understand your argument. I think we do now. Thank you, counsel. I do want to thank the University of Idaho for accepting this case on a pro bono basis. I do, too. Just speaking for myself, however this case comes out, I think they've gotten as good a representation as any petition in this court can expect, and I appreciate your service. And I want to add my agreement to that. This is valuable to our judicial process as well as to the litigants. Thank you.
judges: Kleinfeld, Tashima, Tallman